**In re N–REN CORPORATION, Debtor.**

**Bankruptcy No. 1–86–00144.**

United States Bankruptcy Court,
S.D. Ohio, W.D.

Aug. 5, 1987.

See also, Bkrtcy., 71 B.R. 488.

Timothy J. Hurley, Cincinnati, Ohio, for debtor.

## DECISION and ORDER RE AUCTION PURCHASE PRICE

BURTON PERLMAN, Bankruptcy Judge.

At Cincinnati, in said District, on the 5th day of August, 1987.

This Chapter 11 debtor manufactures nitrogen products for fertilizer use at several facilities in the midwest and southwest. One of these facilities, located at Pryor, Oklahoma, consists of a plant and associated pipeline. A time came when it was deemed the proper course for debtor to follow, that the Pryor facility be sold. Authority was sought from the court to conduct an auction sale thereof, and on May 5, 1987 a public auction was held. The plant and pipeline were offered separately and then together. Finding the sale of the plant and pipeline together to be more productive, the sale concluded in that fashion. The property ultimately was bid in for $4.2 million by Cherokee Acquisitions, Inc. ("Cherokee"). The individual acting on behalf of Cherokee at the sale was Howard Farkas. Cherokee here contends that it is entitled to have the property for a purchase price of $4.1 million. A group of lenders of debtor spearheaded by BancAmerica Commercial Corporation ("BACC"), together with debtor, contest the position of Cherokee, and urge the court to hold that the $4.2 million purchase price was valid.

Cherokee's position for the lower price is based upon the events which occurred at the sale. We find the following to be the facts regarding the sale. At the time of the sale, David Fox, the auctioneer, had two or three assistants who were in the crowd. Their function was to encourage purchasers and to stimulate enthusiasm about the sale. Prior to the opening of bidding, Fox made a statement of the conditions of sale. He said, inter alia:

Ladies and gentlemen, let me review that, specifically, when we start, we will offer the pipeline first. We will get to the high bid. We will reserve that bid. We will then offer the facility separately of the pipeline. When we get to the high bid on that we will reserve that bid. We will then offer the plant facility and the pipeline together as a package as an entirety. When we get to the high bid we will reserve that bid. *We will then confer with the proper parties, the bankers, the lawyers, the debtors-in-possession and so forth, make a decision on how to proceed at that point in time.* Now, ladies and gentlemen, I will tell you that we are specifically requiring the deposit as stated in an effort to bid on the property, if you wish to place a bid ... (Emphasis supplied.)

(The conditions of sale were also spelled out in a brochure and other materials distributed to prospective bidders prior to the sale. It is understood that to the extent there is a disparity between what the auctioneer says at the time of the sale and the printed material, that stated by the auctioneer at the sale prevails.)

It was an active auction with a substantial number of bidders. In accordance with the announced conditions of sale, the pipeline was offered first separately, and a top bid of $400,000.00 was received. That was reserved. The plant was then offered separately and a top bid in the amount of $3,350,000.00 was received, and that was reserved. The plant and pipeline were then offered together. The bidding proceeded past $3,750,000.00 so that it was apparent that the pipeline and plant together would bring a better price than they would separately. The bidding proceeded to $4,100,-000.00, that bid being made by Farkas for Cherokee. At that point, Farkas believed that he had purchased the plant and pipeline.

What happened then was that Fox, the auctioneer, stepped down and entered a building where he conferred with various individuals. He did not, at the point of retiring, announce that the sale was concluded. Fox then re-entered the scene of the sale and announced that he was reopening the bidding. At that point, another bidder, VanGuard, bid $4,150,000.00. Farkas then increased his bid to $4,200,000.00.

The sale was then concluded. Farkas then went with the auctioneer and attorneys and signed the relevant documents for the sale at $4.2 million.

There is a dispute in the evidence as to whether Farkas protested the conduct of the auctioneer in reopening the bidding after he stepped down. Farkas testified that he spoke to one of the auctioneer's assistants who was circulating in the crowd, and his testimony is corroborated by Jerry Bob Willard, who attended the auction and was bidding on his own behalf at that time. Willard said that Fox's assistant conferred with Fox, but Fox went on with the bidding without saying anything about the Farkas objection.

After carefully reviewing the evidence constituting this record, and considering the applicable law, we have reached the conclusion that the sale at $4.2 million was valid, and that the position of Cherokee that the sale was concluded at $4.1 is unsound. It really does not matter that Farkas subjectively believed that he had purchased the property at $4.1 at the time of the interruption in the auction sale. Nor does the dispute as to the fact of whether the auctioneer was advised of an objection to the resumption affect the picture, for the auctioneer would have been justified in disregarding the objection at the time. The reason we say this is that an auctioneer controls the auction sale. The conditions of sale announced at the beginning of the auction govern the proceedings. The auctioneer here announced at the beginning of the sale that there would be an interruption in the bidding—bidders were put on notice that this was a condition of the sale. It is not inconsistent with sound auction practice for there to be such a break in the action. *See, Jones v. Tennessee Valley Authority*, 334 F.Supp. 739, 742 (D.C.M.D. Fla.1971).

Furthermore, it is not disputed that the auctioneer did not announce that the sale was concluded at the time that he recessed the proceedings—the hammer had not yet fallen. Cherokee, in its evidence, does not contend that the auctioneer announced that the hammer had fallen at that point.

There is no dispute between these parties that the sale is not concluded until the hammer falls. On this score, we note that it is not disputed that the auction here in question was of the species of auction known as "with reserve". That means, that the owner of the property has the right to withdraw the property at any time until completion of the sale. It follows from that premise that there must be an express statement by the auctioneer that the sale is completed before that becomes a fact. In the present case, the auctioneer never said that the sale was completed until after the bid of $4.2 million was made.

In opposing the outcome we announce, Cherokee argues that when the recess was called by the auctioneer, the only options open to the seller were either to accept the last bid, or to withdraw the property from bidding. Cherokee offers no basis in law for this position, and indeed it is without merit. The option followed by the auctioneer following the recess of permitting further bidding was also open to it. Cherokee says that its rights were prejudiced when bidding was reopened because it was not given an opportunity to withdraw its prior bid. This record does not support that position. Events move quickly at auctions, but when that is realized, it is clear that there was an opportunity for Cherokee to withdraw its bid, and that opportunity was reasonable in the context of an auction.

Cherokee and debtor have already closed on the sale of the Pryor facility, subject to a determination by this court whether the sale price was $4.1 or $4.2 million. In the foregoing findings of fact and conclusions of law, we hold that the sale price was $4.2 million.

So Ordered.